Pennsylvania Blue Shield, Petitioner *v.* Commonwealth of Pennsylvania, Department of Health, Respondent.

2

.Argued September 11, 1985, before President Judge CRUMLISH, JR. and Judges ROGERS, CRAIG, MAC-PHAIL, DOYLE, COLINS and PALLADINO.

*Thomas E. Wood*, with him, *William H. Wood* and *William E. Miller, Jr., Keefer, Wood, Allen & Rahal,* for petitioner.

*Christine S. Dutton*, Assistant Counsel, with her, *Ruth M. Siegel*, Chief Counsel, for respondent.

*Fred Speaker, Pepper, Hamilton & Scheetz*, for Amicus Curiae, Pennsylvania Medical Society.

*Thomas A. Beckley,* with him, *Jeffrey W. Davis* and *John G. Milakovic, Beckley & Madden,* for Amicus Curiae, Pennsylvania Dental Association.

OPINION BY JUDGE CRAIG, November 13, 1985:

In view of provisions of the participating-physician contract of Pennsylvania Blue Shield (PBS), approved by the Department of Health, which stated

when requested, a doctor must substantiate to PBS's satisfaction by any mutually accepted method that his usual charge of record is the most frequent made to all parties*

may the department order Blue Shield to refund to a group of physicians a sum representing the excess of the medical fees which those physicians charged for a medical procedure to their *insured* patients at a clinic ($155 each) over the fees which those physicians charged for identical service to their *uninsured* patients at the same clinic ($30 each)?

Pennsylvania Blue Shield, a professional health service corporation, appeals from a final order which the Pennsylvania Department of Health issued on February 16, 1984,[1] pursuant to a complaint which a group of Blue Shield participating physicians known as KGD OB-GYN Associates, P.C. (KGD) had filed with the

---

* After April 19, 1978, the phrase "by any mutually accepted method" was deleted.

[1] The Department of Health Order of February 16, 1984 states:
1. Pennsylvania Blue Shield shall within thirty (30) days of the date of this Order refund to KGD OB-GYN Associates, P.C., and/or the Northeast Women's Center, as circumstances may require, the $59,947.00 improperly withheld from the assignment accounts of KGD and the Center. If PBS has not refunded this amount within such thirty (30) days, six percent (6%) per annum simple interest shall accrue on all sums not repaid, until such sums are, in fact, repaid in full.

department against Blue Shield under the General Rules of Administrative Practice and Procedure, 1 Pa. Code §35.9.[2] We affirm in part and reverse in part.

2. PBS shall revise and submit those portions of its Regulations for Participating Doctors dealing with assignment accounts, usual charge determination, and involuntary withholding of alleged overpayments to the Department for review and approval. In addition, all internal guidelines relating to these topics shall be submitted for review, as shall a method of reasonably informing participating doctors of the existence and effect of these guidelines so as to enhance their ability to comply therewith.

3. PBS shall undertake a comprehensive review of its methods of providing participating doctors with an adequate and fundamentally fair procedure for defending themselves against allegations by PBS regarding overpayment disputes and shall revise such current procedures to ensure that they are, in fact, adequate and fundamentally fair. PBS shall submit its findings and proposed revisions, together with a methodology of informing participating doctors of the revised procedures, to the Department for review and approval.

2 §35.9. Formal complaints generally.

Any person complaining of anything done or omitted to be done by any person subject to the jurisdiction of an agency, in violation of a statute or regulation administered or issued by the agency may file a complaint with the agency. If the complaint relates to a provision in a tariff, policy form, or other similar contract document on file with the agency, the document should be identified. A copy of the complaint will be forwarded by the agency to the respondent who will be called upon to satisfy the complaint or to answer the same in writing within the time specified in §35.35 (relating to answers to complaints and petitions), or such lesser time as may be prescribed by statute, after the date of service of the complaint, unless the agency with or without motion shall prescribe a different time. If, in the judgment of the agency, a violation of a statute or regulation administered or issued by the agency has been alleged and has not been satisfied adequately the agency will either invite the parties to an informal conference, set the matter for a formal hearing, or take any other action which in the judgment of the agency is appropriate. In the event that a hearing is held the complainant automatically shall be a party thereto and need not file a petition for leave to intervene.

The applicable Blue Shield contract provisions, in effect at the time of this dispute and previously approved by the department, read:

## B. GENERAL REGULATIONS

20. All matters, disputes or controversies related to the services performed by Participating Doctors or any questions involving professional ethics shall be considered, acted upon, disposed of and determined only by doctors in the manner provided by the By-Laws of PBS.

## D. PREVAILING FEE PROGRAM

2. *Payment will be made by PBS under this program according to the following criteria:*
*Usual: The fee which an individual doctor most frequently charges to his patients for the procedure performed.*
*Customary: The customary range of usual fees charged by doctors of similar training and experience in a given geographic area for the procedure performed.*
*Reasonable: The fee which differs from the usual or customary charges because of unusual circumstances involving medical complications which require additional time, skill and experience.*

* * * *

4. A doctor's usual charge of record for any procedure will be determined from charges actually submitted by that doctor for all PBS Doctor's Service Reports and on all Medicare Requests for Payment and CHAMPUS (Civilian Health and Medical Program of the Uniform Services) claim forms. However, *when*

*requested, a doctor must substantiate to PBS'
satisfaction,* by any mutually accepted method,
*that his usual charge of record is the most
frequent made to all patients.* If a review of a
doctor's records indicates any usual charge is
not valid, PBS may use this additional infor-
mation in its determination of a usual charge.
(Emphasis added.)

Thus to qualify for reimbursement, the doctor's
charge for any single class of service (*e.g.* all KGD
patients at the Center) cannot depart from the usual
fee.

KGD, a professional corporation owned by three
physicians, maintains a private practice in obstetrics
and gynecology. During the period involved in this
payment dispute, from 1978 through June 1981, the
KGD physicians were charging their patients $300
for an abortion performed in their private offices.
KGD also had a contract with a clinic known as the
Northeast Women's Center (Center). The contract
between KGD and the Center provided that any pa-
tient treated at the clinic having insurance coverage
would be considered a "private" patient of KGD.
KGD billed the abortion patient's health insurance
carrier its "private" fee of $300, from which KGD
paid $145 to the Center for overhead costs and re-
tained the remaining $155 as its doctor's fee. On the
other hand, the arrangement labeled cash-paying pa-
tients at the clinic as "Center" patients, even though
KGD's doctor-patient relationship with those patients
was exactly the same as the relationship with the in-
sured patients. The Center charged the cash-paying
patients $175 for an abortion, $145 of which the Cen-
ter retained for its overhead costs, with the remaining
$30 being paid to KGD as doctor's fee.

Tabulated, the fee-charging pattern was as follows:

### KGD Clinic Patients

| Cash-Paying | Third-Party Payor |
|---|---|
| $175 Charge | $300 Charge |
| -$145 Clinic Overhead Fee | -$145 Clinic Overhead Fee |
| $ 30 KGD Doctor's Fee | $155 KGD Doctor's Fee |

### KGD Private Office Patients

$300 Charge
-300 KGD Overhead and Doctor's Fee

All patients treated at the Center, whether designated as "Center" patients or "private" patients, received precisely the same services from KGD and the Center. The only standard used to differentiate between the "Center" and "private" patients was whether the fee was to be paid by the patient or submitted to a third-party payor. However, the medical fee which KGD charged Blue Shield for its insured patients at the clinic was *five times greater* than the fee charged to the cash-paying clinic patients.

Blue Shield's Medical Review Committee, composed of physicians, met on May 5, 1981, and determined that KGD had overcharged Blue Shield. A KGD physician presented their position regarding the overcharges to the Medical Review Committee on September 15, 1981. The Medical Review Committee reaffirmed its determination of an overcharge. Ultimately, in October 1981, Blue Shield set up a separate Center assignment account for abortions which KGD performed at the Center, under which KGD now charges a uniform medical fee of $32.50 ($195 total clinic fee) to both the insured and uninsured patients at the Clinic.

An assignment account is an administrative creation within Blue Shield's files which allows accumulation and attribution of charge data to some entity

other than the name of an individual participating doctor actually rendering a covered service.

Although Blue Shield and KGD presented some conflicting testimony to the Department of Health, the facts indicate that Blue Shield was not forthcoming with the idea of identifying KGD's patient classes with different assignment accounts. On the other hand, the facts do not indicate that the KGD physicians definitively communicated to Blue Shield their questions or concerns regarding the classification of patients for fee purposes. All parties agree that KGD indeed provided services to two distinct classes of patients. One class of patients consisted of those treated in KGD's private offices for a $300 fee each. This $300 fee reflected KGD's overhead costs and a doctor's professional fee. The other class of patients consisted of those treated at the clinic where the fee charge reflected the Center's overhead costs and the doctor's professional fee. Of course, in professional truth, every woman to whom KGD rendered service was a KGD patient whether KGD rendered the service at its private offices or at the Center.

The Medical Review Committee determined the total overpayment amount which KGD owed Blue Shield to be $59,947. Because KGD refused to refund this amount to Blue Shield, Blue Shield began to withhold monies from both the KGD account and the Center account.

In March, 1982, KGD filed its formal complaint with the Secretary of Health regarding Blue Shield's withholding of earned fees. In June, 1982, the department ordered Blue Shield to cease withholding from the Center and KGD accounts. Blue Shield did not comply.

In September, 1982, the department issued a subpoena to Blue Shield requesting information relating

to KGD's overcharge dispute. This court enforced the subpoena by order issued December 18, 1982.[3] By the order involved in this appeal, the department directs Blue Shield to: (1) refund the $59,947 which the department decided was improperly withheld from KGD and the Center; (2) revise for approval its usual charge and withholding provisions and; (3) revise for approval its methods relating to the usual charge provisions to allow participating physicians involved in overpayment disputes a fundamentally fair procedure for defending themselves.

## Fee Discrimination Against Insured Patients at the Center

We reverse the department's decision that Blue Shield improperly withheld $59,947.

When the KGD physicians became participating doctors of Blue Shield, they agreed to comply with Blue Shield's contract provisions which the department had reviewed and approved. Among those provisions is the "usual charge" restriction which, in essence, guarantees Blue Shield that each participating doctor will charge a standard fee to all patients receiving like services under like circumstances. The undisputed facts indicate that the KGD physicians did not comply with this usual charge restriction when

---

[3] *Department of Health v. Pennsylvania Blue Shield*, (No. 3006 C.D. 1982, filed December 28, 1982):

Here, Pennsylvania Blue Shield has refused to comply with certain parts of the subpoena on the ground the information sought is not within the scope of the agency's investigative power. As described by the Department in its brief and in argument, the investigation is not one of Pennsylvania Blue Shield's financial operations but rather of the application and impact of regulations previously approved by the Department. This is within the authority of the Department as defined in 40 Pa. C. S. §6301 *et seq.*

they charged their insured clinic patients $155 for an abortion while charging their uninsured clinic patients $30 for an abortion. KGD provided the same service and used the same facility for all the patients at the clinic. KGD's fiction of separate patient designations, based on the patient's means of payment, was the main cause of this dispute. The department appears to justify KGD's creation of that fiction by attributing it to a failure of Blue Shield to create alternate billing arrangements for KGD's patients at the Center. The facts do not justify that faulty characterization.

In June, 1977, approximately one month after KGD had contracted with the Center to perform abortions there, the KGD physicians followed formal Blue Shield procedures and applied for a billing account for their private offices. KGD never mentioned the arrangement with the Center at that time. In July 1977, Blue Shield set up a billing account for KGD and identified the person to whom the KGD physicians were to direct any inquiries concerning their billing account. KGD never asked that person how to make a separate billing arrangement for Blue Shield patients at the clinic. The *Center* contacted Blue Shield in May of 1977 to obtain an assignment account for *its* Blue Shield patients. Blue Shield denied the Center's request for an assignment account, but expressly stated that Blue Shield would permit the Center's employed doctors to bill for any covered service under their own names. Blue Shield had no knowledge at that time of the contractual relationship between KGD and the Center.

The KGD physicians never definitively contacted their designated Blue Shield representative to inform Blue Shield of their perceived predicament. A KGD physician testified that KGD did telephone Blue

Shield about their problem, but that whoever answered the phone merely told them that Blue Shield could not accommodate their special billing problem. A group of professional physicians who had already displayed their ability to request and receive a Blue Shield billing account must be presumed capable of communicating a billing problem to their designated Blue Shield representative. The record contains too many formal communications between KGD and Blue Shield to allow testimony as to an anonymous Blue Shield telephone response to substantiate a finding that Blue Shield denied KGD a separate assignment account for their Blue Shield patients treated at the clinic. Once the KGD physicians clearly requested a separate classification —— an assignment account ——for their Blue Shield patients at the Center, Blue Shield accommodated their request. The KGD physicians' lack of information as to how to bill their Blue Shield patients at their private offices one fee and to bill their Blue Shield patients at the Center another fee does not warrant their faulty characterization of patient classes at the Center.

The department contends that Blue Shield could have cured this problem by simply creating an assignment account for KGD's Blue Shield patients at the clinic. Yet, the cure was not just another assignment account, but to charge all the patients at the clinic the same fee for the same service. An assignment account which permitted KGD to charge its Blue Shield patients at the clinic $155 while charging its cash-paying patients at the clinic $30 still would have been discriminatory.

The department also contends that KGD's treatment of insured patients at the center could not have constituted a violation of Blue Shield's contract because now, after the establishment of a separate cen-

ter assignment account for the insured patients at the center, Blue Shield allegedly is condoning and approving the same discrimination as that which it previously condemned. The record flatly contradicts the factual basis for that contention. Under the revised accounting approach now in effect, the present charging pattern is that which Blue Shield has sought: at the Center, insured patients pay KGD the same amount for the abortion service as cash-paying patients, with KGD's patients elsewhere paying, as always, a higher fee because KGD's overhead is involved.

The department also erred as a matter of law. Careful review of the governing statute establishes that the department has no authority to issue money judgments in favor of health providers against Blue Shield.

The department's statutory authority to supervise and regulate professional health service corporations is found in 40 Pa. C. S. §§6301-6335. The rights of doctors in relationship to a professional health service corporation are set forth in 40 Pa. C. S. §6324.[4] The department asserts that its power to approve Blue Shield's regulations would be useless, if, once ap-

---

[4] §6324. Rights of health service doctors

(a) Admission to plan.—Every health service doctor practicing within the area covered by any professional health service corporation shall have the right, on complying with such regulations as the corporation may make with the approval of the Department of Health, to register with such corporation for such general or special professional health services as he may be licensed to practice, within that area, but the corporation may, with the approval of the Department of Health, refuse to place the name of any health service doctor on its register. Any professional health service corporation may, with the approval of the Department of Health, remove from its register the name of any health service doctor after due notice and opportunity for hearing for cause satisfactory to the corporation.

proved, regulations could be violated or applied inappropriately with no oversight by the department. The department retains the authority to oversee the implementation of health service plans. However, the legislature did not confer upon the department a power to determine culpability and award damages should a dispute arise involving an approved contract provision. In 40 Pa. C. S. §6324(c), the law expressly authorizes health service doctors (as prescribed in the professional health service corporation by-laws) to hear and decide disputes between the doctors and the professional health service corporation. In this case, Blue Shield's Medical Review Committee performed that function by hearing and deciding this overcharge dispute. Health service "regulations" which the department must review and approve are no more than contractual agreements between the doctor and the professional health service corporation. A doctor can always seek review of an unfavorable Medical Review Committee decision concerning a contractual provision with the professional health service corporation in the

---

(b) Freedom from control.—Subject to the provisions of section 6322(e) of this title (relating to liability of corporation limited), a professional health service corporation shall impose no restrictions on the health service doctors who administer to its subscribers, as to methods of diagnosis or treatment. The relation between a subscriber, or any of his dependents, and the health service doctor shall be identical with the relation that ordinarily exists in the community between a health service doctor and his patient. Subject to the provisions of subsection (a) of this section, no person shall be permitted to interfere with the choice or selection by a patient of his health service doctor after that choice or selection has been made by an adult of sound mind.

(c) Disputes.—All matters, disputes, or controversies relating to the professional health services rendered by the health service doctors, or any questions involving professional ethics, shall be considered and determined only by health service doctors as selected in a manner prescribed in the bylaws of the professional health service corporation.

appropriate state court with jurisdiction over contract disputes. Nowhere did the legislature confer upon the department a power of appellate review of the Medical Review Committee's decisions.

The department asserts that this court held in *Pennsylvania Dental Association v. Department of Health*, 75 Pa. Commonwealth Ct. 7, 461 A.2d 329 (1983), that the department had the authority to settle disputes between doctors and professional health service corporations through the complaint and hearing process, but that interpretation is too expansive. This court held that the Department of Health, pursuant to section 6324(a), could require the inclusion of certain elements in a professional health service corporation's method of reviewing the professional fees of its participating doctors, without transgressing the privacy rights of patients. This court did not hold that the department had authority to adjudicate specific contract disputes between doctors and their professional health service corporations.

The department also interprets 40 Pa. C. S. §6310[5] as giving it authority to settle disputes and grant relief. Because that section authorizes the department to commence an action in mandamus or for an injunction to prevent any violation of a professional health service corporation provision, "in addition to all other remedies in law or equity," the department asserts

---

[5] §6310. Enforcement

When necessary to effect the purposes of this chapter, in addition to all other remedies in law or equity, the Insurance Department or the Department of Health, or both, may commence an action in mandamus or for an injunction to prevent any violation of the provisions of this chapter or the continuance of any such violation, or to enforce compliance herewith. Any court having jurisdiction is hereby vested with authority to determine the cause and to issue such process as may be necessary to accomplish the purposes of this chapter.

that the legislature has conferred upon it all legal and equitable remedial authority. The department has incorrectly interpreted this enforcement provision. The reference to "other remedies" clearly means that the department has available to it all other judicial remedies at law or in equity.

The department also contends that 40 Pa. C. S. §6332[6] gives it power to adjudicate and award damages. That section authorizes the department to regulate and supervise professional health service corporations to insure adequate services to subscribers in accordance with the best professional health service

---

[6] §6332. Regulation by Department of Health.

(a) Annual reports.—Every professional health service corporation shall, on or before March 1 of each year, file with the Department of Health a report of its activities, other than its financial activities, during the preceding calendar year. Every such report shall be verified by at least two of the principal officers of the corporation and shall be in such form, and shall contain such matter, as the Department of Health shall prescribe. The Department of Health is hereby authorized to inquire into the activities of every professional health service corporation and to determine whether the corporation is providing adequate professional health services to its subscribers in accordance with the best professional health service practice in the community.

(b) Examination and special reports.—The Department of Health and its agents shall have free access to all the books, records, papers and documents that relate to the business of the corporation, other than financial, and the power to examine the officers, agents, employees, and subscribers for the professional health services of the corporation, and all health service doctors registered with the corporation, and all other persons having or having had substantial part in the work of the corporation, in relation to its affairs, transactions, and condition of the corporation, other than financial. Such examinations shall be made at such time as the Department of Health shall deem necessary. The Department of Health may, at any time, without making such examination, call on any such corporation for a written report, authenticated by at least two of its principal officers, concerning the affairs of the corporation other than its financial affairs.

16

practice in the community. The department argues that to exclude from it the power to award relief to an aggrieved party would defeat the purpose of this statute. However, section 6332 authorizes the department to order a professional health service corporation to extend or improve the services it furnishes should the department determine, upon review, that the professional health service corporation was not providing service to its subscribers in accordance with the best professional health service practice in the community. This section of the statute states the extent and limits of the department's examination of a professional health service corporation's business, authorizes the department to order improved service, and specifically allows judicial review of the department's orders. Clearly, the section gives the department administrative powers, not judicial functions. The department does not need any implied power to issue money judgments in order to effectuate the policy of insuring subscribers adequate professional health service care.

Next, the department argues that section 35.9 of the General Rules of Administrative Practice and Procedure[7] under which KGD filed its complaint should be read together with the statutory provisions to authorize the department's action in this case. Section

---

(c) Extension or improvement of service pursuant to order.— In the event the Department of Health finds that a professional health service corporation does not provide adequate professional health services to its subscribers in accordance with the best professional health service practice in the community, the Department of Health may notify the corporation of its findings and order the corporation, in specific terms, to extend or improve the professional health services furnished by the corporation. Such order shall be entered after notice and opportunity for hearing and shall be subject to judicial review in the manner and within the time provided by law.

[7] See fn.2.

35.9 pertains to alleged violations of a "statute or regulation administered or issued" by a state agency. Here, the complaint actually alleged a violation of a Blue Shield contract provision called a "regulation." Although the department had approved this contract provision or "regulation", it is neither a statute nor a regulation administered or issued by the department. Hence, the language of section 35.9 cannot be construed to authorize the department's actions.

Finally, the department urges that this court's enforcement[8] of the department's subpoena to Blue Shield to produce documents relating to the KGD billing dispute is indicative of the department's authority to adjudicate this dispute. This court's order enforced the subpoena on the basis that the agency had power to review "the application and impact of regulations previously approved by the Department." The order did not imply that it is within the department's power to adjudicate a dispute and grant relief in the nature of a money judgment.

## Fair Contract Procedures

The department has also ordered Blue Shield to revise its internal procedures for participating doctors regarding assignment accounts, the usual charge restrictions, and involuntary withholding of funds, and to submit these revisions to the department for review and approval. Additionally, the department ordered Blue Shield to revise its internal procedures regarding overpayment disputes in order to provide participating doctors an adequate and fundamentally fair opportunity to defend themselves.

The issue thus presented is: Where a statute authorizes the department to approve contract provi-

---

[8] See fn.3.

sions between a professional health service corporation and its participating doctors, may the department require the professional health service corporation to revise its contract provisions to insure that in the future a professional health service corporation will be more forth-coming and helpful to its participating doctors as to how appropriate fees are determined and to accommodate their special billing problems, as well as to provide the participating doctors a fair opportunity to express their position on a dispute? We conclude that the department has such powers, even though we reject KGD's contention that constitutional due process concepts are applicable between these private contracting parties.

The department was legitimately disturbed with Blue Shield's professed attitude that a participating doctor could always withdraw from Blue Shield's participating doctor program if the doctor was not satisfied with the implementation of Blue Shield's participating doctor regulations. Obviously, encouraging non-participation is not conducive to implementing the policy behind the creation of professional health service corporations which is to provide adequate health service care to those who are unable to provide it for themselves.[9] A better policy is to insist that professional health service corporations implement internal procedures which openly provide the participating doc-

---

[9] §6303. Statement of legislative findings and policy.

(a) Declaration of necessity.—It is hereby declared that adequate professional health services are essential for the maintenance of the physical and mental health of the residents of this Commonwealth, and that it is necessary that provision be made for adequate professional health services to persons of low income who are unable to provide such services for themselves or their dependents without depriving themselves or their dependents of such necessaries of life as food, clothing and shelter.

tor with a full range of available billing alternatives. In fact, such up-front disclosure could have avoided this dispute. The better policy is to require a professional health service corporation to provide its participating doctors a fair opportunity to address alleged violations. As noted above, the department has power under 40 Pa. C. S. §6332[10] to order Blue Shield to improve its professional health services. By requiring Blue Shield to be more forthcoming with its participating doctors regarding available billing alternatives, and methods of determining appropriate fees, and to insure a fundamentally fair opportunity to justify alleged violations, doctors will be more likely to maintain their relationship as participating physicians. Surely, encouraging doctors to continue their participation with Blue Shield is beneficial to Blue Shield as well as an effective way for the department to effectuate the policy of providing affordable health care to citizens of the Commonwealth.

Accordingly, we reverse the order of the department to the extent it requires Blue Shield to refund the $59,947 which it withheld from the KGD and Center accounts; we affirm the order of the department to the extent it requires Blue Shield to revise its internal procedures regarding assignment accounts, fee determinations and physician participation in disputes presented to the Medical Review Committee.

---

(b) Construction of chapter.—It is hereby declared to be the purpose and intent of this chapter and the policy of the General Assembly to authorize qualified persons to provide adequate professional health services for residents of this Commonwealth who are unable to provide such services for themselves or their dependents at their own cost without depriving themselves or their dependents of such necessaries of life as food, clothing and shelter, and provide persons of over-income with the limited professional health services benefits set forth in this chapter.

[10] See fn.7.

ORDER

Now, November 13, 1985, we reverse the order of the Department of Health, dated February 16, 1984, to the extent it required Blue Shield to refund the amount of $59,947 to KGD and the Center. We affirm the remainder of that order.